WILLIAM D. STROBEL et al., Appellants, Impleaded with Others, *v.* THE KERR SALT COMPANY, Respondent.

164 303
165 187
s165 617

1. RIPARIAN RIGHTS — GENERAL RULES NOT RELAXED IN FAVOR OF GREAT INDUSTRIES. The doctrine that relaxes the ordinary rules governing the rights of riparian owners in favor of great industries engaged in the development of the natural resources of the country has never been adopted by the Court of Appeals of this state, and no public necessity exists therefor.

2. GENERAL RULES — CO-RELATIVE RIGHTS OF RIPARIAN OWNERS. In the absence of modification by grant or prescription, a riparian owner is entitled to a reasonable use of the water flowing by his premises in a natural stream, as an incident to his ownership of the soil, and to have it transmitted to him without sensible alteration in quality or unreasonable diminution in quantity. While he does not own the running water, he has the right to a reasonable use of it as it passes by his land. As all other owners upon the same stream have the same right, the right of no one is absolute, but is qualified by the right of the others to have the stream substantially preserved in its natural size, flow and purity, and to protection against material diversion or pollution. This is the common

right of all, which must not be interfered with by any. The use by each must, therefore, be consistent with the rights of the others, and the maxim of *sic utere tuo* observed by all. The rule of the ancient common law is still in force — *aqua currit et debet currere, ut currere solebat.*

3. LAWFUL USES OF STREAM. Consumption by watering cattle, temporary detention by dams in order to run machinery, irrigation when not out of proportion to the size of the stream, and some other familiar uses, although in fact a diversion of the water involving some loss, are not regarded as an unlawful diversion, but are allowed as a necessary incident to the use in order to effect the highest average benefit to all the riparian owners. As the enjoyment of each must be according to his opportunity and the upper owner has the first chance, the lower owners must submit to such loss as is caused by reasonable use.

4. REASONABLE USE DEPENDS UPON CIRCUMSTANCES. Surrounding circumstances, such as the size and velocity of the stream, the usage of the country, the extent of the injury, convenience in doing business and the indispensable public necessity of cities and villages for drainage, are also taken into consideration, so that a use which, under certain circumstances, is held reasonable, under different circumstances would be held unreasonable. It is also material, sometimes, to ascertain which party first erected his works and began to appropriate the water.

5. UNREASONABLE USE IS A QUESTION OF LAW. The question of reasonable use is generally a question of fact, but whether the undisputed facts and the necessary inferences therefrom establish an unreasonable use is a question of law.

6. FACTS ESTABLISHING UNREASONABLE USE. When the diversion, or pollution, which is treated as a form of diversion, is caused by a new and extraordinary method of using the water, hitherto unknown to the state, and such method not only permanently diverts a large quantity of water from the stream, but also renders the rest so salt at times that cattle will not drink it unless forced to by necessity, fish are destroyed in great numbers, vegetation is killed and machinery rusted, such use as a matter of law is unreasonable and entitles the lower riparian owner to relief.

7. POWER OF COURT OF EQUITY TO RESTRAIN UNREASONABLE USE. Where the natural and necessary result of the place selected and the method adopted by an upper riparian owner in the conduct of his business is to cause material injury to the property of an owner below, a court of equity will exercise its power to restrain on account of the inadequacy of the remedy at law and in order to prevent a multiplicity of suits. The lower riparian owners are entitled to a fair participation in the use of the water and their rights cannot be cut down by the convenience or necessity of the business of an upper riparian owner.

8. GREAT INDUSTRIES LOCATED ON NATURAL STREAMS NOT PERMITTED TO INFLICT SUBSTANTIAL INJURY UPON LOWER RIPARIAN PROPERTY. While the courts will not overlook the needs of important manufacturing interests, nor hamper them for trifling causes, they will not permit sub-

stantial injury to neighboring property, with a small but long-established business, for the purpose of enabling a new and great industry to flourish. They will not change the law relating to the ownership and use of property in order to accommodate a great business enterprise. According to the old and familiar rule, every man must so use his own property as not to injure that of his neighbor, and the fact that he has invested much money and employs many men in carrying on a lawful and useful business upon his own land, does not change the rule, nor permit him to permanently prevent a material portion of the water of a natural stream from flowing over the land of a lower riparian owner, or to so pollute the rest of the stream as to render it unfit for ordinary use.

9. WHEN COURT OF EQUITY WILL ENJOIN UNREASONABLE USE OF NATURAL STREAM. Where one riparian proprietor by his use causes a deterioration of the water of a natural stream, the fact that others are using it in the same manner instead of preventing relief may require it, and even if the damages are slight, where the act complained of is such that by its repetition or continuance it may become the foundation or evidence of an adverse right, a court of equity will interpose by injunction.

10. PARTIES — WHEN RIPARIAN OWNERS MAY UNITE IN ACTION TO RESTRAIN UNREASONABLE USE. Different riparian owners of distinct parcels of riparian land, who have a common grievance for an injury of the same kind, inflicted at the same time and by the same acts, though the injury differs in degree as to each owner, may unite in a common action to enjoin a higher riparian owner from diverting or polluting the stream.

11. PERMANENT INJUNCTION MAY BE REFUSED CONDITIONALLY BY A COURT OF EQUITY. A court of equity may require, as a condition of withholding a permanent injunction restraining an upper riparian proprietor from diverting or polluting the waters of a natural stream by using it in a new or peculiar manner for the manufacture of salt, the construction of a reservoir on the upper sources of the stream to accumulate water when it is plentiful for use in time of scarcity, and thus neutralize the diminution caused by the manufacture of salt, and may also require on the like condition greater care in preventing the escape of salt water and salt substances into the stream, and thus prevent or minimize the pollution.

*Strobel* v. *Kerr Salt Co.*, 24 App. Div. 626, reversed.

(Argued June 19, 1900; decided October 2, 1900.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered January 21, 1898, affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court on trial at Special Term.

This action was commenced in 1892 by fourteen plaintiffs who own various mills on Oatka creek, a natural stream run-

ning through the counties of Wyoming, Genesee and Monroe, against the defendant, a domestic corporation engaged in the manufacture of salt at a point on said creek above the mills of the plaintiffs, to restrain it from diverting or polluting the waters thereof. The action is for an injunction only, as the plaintiffs in their complaint expressly reserve "to themselves and each of them their several damages     *     *     *     which they will seek to recover in several actions at law in due time to be prosecuted for that purpose." In its answer the defendant denied that it had diverted or polluted the water of the stream, except that in carrying on the business of manufacturing salt upon its own premises, it had made a reasonable use of a small portion of said water, and alleged that such use was necessary and lawful.

Upon the trial in 1893 it appeared that Oatka creek formerly contained pure water, which was valuable for various purposes, and especially for use in manufacturing. The plaintiffs and their predecessors in title have owned mills and manufactories situated upon said stream from one and one-half to thirty miles below the salt works of the defendant, and have operated them by the water thereof for many years, one at least since 1825. While they still depend mainly upon water power to run their machinery, some of them are now using steam to a certain extent. There is less water in the stream at present than there was a few years ago, and the plaintiffs attribute the deficiency mainly to the diversion of water by the salt works of the defendant and others, recently erected, while the defendant insists that it is owing to the clearing away of forests and the drainage of swamps. The evidence does not show any material change in the forests of the valley during the past ten or fifteen years, but it appears that streams in western New York have generally lessened in size during the past twenty-five or thirty years.

Since 1886 the defendant has carried on the business of manufacturing salt at a point upon said stream above the mills of the plaintiffs. The watershed above its works comprises about fourteen square miles, and that below about one hun-

dred and forty. Its plant consists of 250 acres of land lying upon the creek, with extensive buildings, machinery and appliances for the manufacture of salt. It has sunk seven wells upon its premises, each about 2,000 feet deep, at the bottom of which rock salt is found in two beds, which vary in depth from 30 to 60 feet. The salt is not mined, but water is pumped from a reservoir fed by a race from Oatka creek, forced down one pipe to the bed of salt, where it speedily becomes saturated, and thence in the form of brine is forced by hydraulic pressure up another pipe into storage tanks upon the surface of the ground. It is then drawn by gravity through a system of pipes into shallow pans and grainers, which are widely spread over the land of the defendant, where it is evaporated by exposure to the air and by means of steam and artificial heat. The function of the water is to bring the salt to the surface in solution, where it is first purified by the use of lime and then evaporated, leaving a residuum of salt suitable for domestic purposes. All the water that is forced down into the earth and up again must be turned into vapor before the solid salt can be extracted therefrom. The water taken by the defendant for this purpose and for use in its boilers to run the necessary machinery is about 20,000 cubic feet, or 150,000 gallons a day, which is more than 104 gallons per minute, and is about four per cent of the flow of the stream in low water at the mills of the plaintiffs nearest the defendant's works. The part totally consumed in the boilers is very slight, as the steam is condensed into water by artificial means and used over again.

The leakage from the salt after it is removed from the evaporating pans falls upon the surface of the ground, and scales, which are a combination of lime and salt formed during the process of manufacture, are thrown from the grainers and pans upon the land of the defendant, all of which is within the drainage area of the Oatka. Much of this refuse, mixed with ashes, was used to fill up low places about the buildings so as to protect them in high water.

The stream is small, but no complaint is made of any defi-

ciency in the supply of water except during the dry season of
the year, when the plaintiffs have less than they need to oper-
ate their mills, and less than they had before the erection
of the defendant's works. The waters of the creek have
become so salt as at times to be unfit for watering cattle
as well as for many other uses both domestic and mechanical.
The effect has been to destroy the most of the fish and
certain kinds of vegetation growing in the stream or upon
the margin.

There are twelve other salt works, somewhat widely sep-
arated, situated upon said creek below those of the defendant,
which are operated in the same way and contribute their
quota of diminution and pollution. The drainage from sev-
eral villages also affects the purity of the water, especially
when the stream ·is low. Salt is the leading industry of the
Oatka valley, and only one company actually mines by means
of shafts sunk to the beds of salt. The salt so mined is
dark, impure and unfit for ordinary uses, unless it is dissolved,
purified and the water evaporated. The amount made daily
by the defendant is about 860 barrels of pure white mer-
chantable salt, but the full capacity of its works is nearly
1,200 barrels. It furnishes employment to more than one
hundred men and women. The capacity of the other salt
manufactories, not including the one which mines its salt in
bulk, is about 9,800 barrels daily. It requires 13.35 cubic
feet of brine, of the usual strength, or more than 100 gal-
lons, to make a barrel of salt. The effect of taking 150,000
gallons of water from the stream without restoring any part
of it, or making any allowance for evaporation, would deprive
the plaintiffs of 3 8-10 horse power during an entire day of
twenty-four hours, or more than 9 horse power for a work-
ing day of ten hours, assuming that the water when not in
use is saved by means of dams. If the production by the
other works involves a proportionate use of the water, the
number of horse power taken away would be increased
accordingly. Salt water rusts machinery, deranges the opera-
tion of boilers and requires the frequent replacement of pipes

cocks, etc., although it is used generally in steam vessels on the high seas.

Upon the trial, which took place about seven years after the defendant had established its plant, the conflict in the testimony was mainly confined to the degree of diminution and pollution. The amount of diminution depends largely upon the alleged return of the water to the stream after it had been converted into vapor and allowed to escape in the air. The amount of pollution depends largely upon when the samples of water, which were analyzed by chemists, were taken from the stream, as those taken in high water contained a small amount of salt when compared with those taken during low water.

The trial court found among other facts that "the configuration of the ground on either side of the stream is such that the water or vapor escaping from said boilers or grainers as it condenses into water naturally returns to the same stream. * * * That in the process of manufacturing salt, some water containing salt in solution has flowed by such natural drainage from said works into said stream; that since the beginning of this action the defendant has constructed a trench between its works and the said stream so located and constructed as to carry any water containing salt in solution that might escape by drainage from defendant's works into its said salt wells; that it has not been shown that defendant diverts the water of the stream or that it makes any other use of it except in the mining and manufacture of salt on its own lands as hereinbefore set forth; or that it has caused or permitted the escape of foreign substances into said stream except by the natural drainage from its own lands as aforesaid. The use of the waters of said creek, made as aforesaid by the defendant, is a proper and necessary use of the same upon its said premises in the transaction of its said business, and is a reasonable use thereof, such as it was lawfully entitled to make and not prejudicial to the rights of the plaintiffs."

It was found as a conclusion of law that the plaintiffs were not entitled to any part of the relief demanded in their com-

plaint, which was dismissed upon the merits, with costs. Upon appeal to the Appellate Division the judgment entered accordingly was affirmed without an opinion, except that one of the justices who dissented wrote elaborately in favor of reversal. Seven only of the plaintiffs have appealed to this court.

*Henry Selden Bacon* for appellants. The refusal of the trial court to find that the amount of water diverted, or threatened to be diverted by the defendant, and prevented from reaching the stream again by evaporation, is about 20,000 cubic feet, or 150,000 gallons per day, was error. (*Hudson* v. *R., W. & O. R. R. Co.*, 145 N. Y. 408; *Matter of Harriott*, 145 N. Y. 540.) The acts admitted by the defendant amount in law to a diversion, in the technical sense, and the question of reasonable use does not arise. (*Parker* v. *Griswold*, 17 Conn. 288; *Garwood* v. *N. Y. C. & H. R. R. R. Co.*, 83 N. Y. 400.) Whether the acts complained of amount to a diversion or not, the use made is in law not reasonable. (*Clinton* v. *Myers*, 46 N. Y. 511; *Barnard* v. *Shirley*, 135 Ind. 547; *C., etc., Co.* v. *Tucker*, 48 Ohio St. 41; *Beach* v. *S. I. & Z. Co.*, 54 N. J. Eq. 65; *Young* v. *B. D. Co.*, L. R. [App. Cas. 1893] 691; *Mann* v. *Retsof Co.*, 49 App. Div. 454; *Prentice* v. *Geiger*, 74 N. Y. 341; *Canfield* v. *Andrew*, 54 Vt. 1; *Snow* v. *Parsons*, 28 Vt. 559; *Jacobs* v. *Allard*, 42 Vt. 403.) The exceptions to rulings upon evidence present reversible error. (High on Injunctions, § 16; Kerr on Injunctions, 4–7; Angell on Watercourses, § 449; *Corning* v. *T. I. & N. Factory*, 40 N. Y. 191; *Davis* v. *Lambertson*, 56 Barb. 480; *Garwood* v. *N. Y. C. R. R. Co.*, 83 N. Y. 400; *Goldsmid* v. *Comrs.*, L. R. [1 Eq.] 160; *W. & B. Nav. Co.* v. *S. W. W. Co.*, L. R. [9 Ch. App.] 451.) The custom of salt manufacturers to pollute the stream can have no effect to protect one of them in such injury to his neighbors. (*Smith* v. *Wright*, 1 Caines, 43, 45; *Columbus Co.* v. *Tucker*, 48 Ohio St. 41.)

*Norris Morey* for respondent. An owner of land has the right to work, develop and improve his own real property,

and to produce and market its natural products, whether mineral or otherwise, and to allow drainage and refuse therefrom to pass into the natural watercourses pertaining thereto. (*Booth* v. *R., W. & O. T. R. R. Co.*, 140 N. Y. 276 ; *French* v. *Vix,* 143 N. Y. 90 ; *Negus* v. *Becker,* 143 N. Y. 303 ; *McCormick* v. *Horan,* 81 N. Y. 90 ; *P. C. Co.* v. *Sanderson,* 113 Penn. St. 126 ; *Peck* v. *Goodberlett,* 109 N. Y. 180 ; *Waffle* v. *N. Y. C. R. R. Co.,* 54 Barb. 89 ; *W. C. I. Co.* v. *Kenyon,* L. R. [6 Ch. Div.] 773.) Every owner of land upon a running stream has a right, incident to his ownership of land, to make a reasonable use of the water of such a stream, upon and in connection with his land. (Cooley on Torts, 582, 584 ; *Prentice* v. *Geiger,* 74 N. Y. 341 ; *Gould* v. *B. D. Co.,* 13 Gray, 443 ; *Bullard* v. *S. V. M. Co.,* 77 N. Y. 525 ; *Townsend* v. *Bell,* 53 N. Y. S. R. 614 ; 70 Hun, 557 ; *Thomas* v. *Brackney,* 17 Barb. 654 ; Angell on Watercourses [Perkins' ed.], 117–119, 140 ; Gould on Waters, §§ 208, 217, 220 ; *Snow* v. *Parsons,* 28 Vt. 459 ; *Holden* v. *Lake Co.,* 53 N. H. 552 ; *K. & W. Mfg. Co.* v. *U. Mfg. Co.,* 39 Conn. 576 ; *Hetrich* v. *Deachler,* 6 Penn. St. 32 ; *P. C. Co.* v. *Sanderson,* 113 Penn. St. 126.) The reasonable use of a stream by one proprietor may be to the injury or detriment of another proprietor, and the advantage which the upper owner has over the one below him, by reason of his position above upon the stream rather than below, is one to which each of the lower riparian owners are necessarily subject. (*Bullard* v. *S. V. Mfg. Co.,* 77 N. Y. 527 ; *Palmer* v. *Mulligan,* 3 Caines, 308 ; *Gould* v. *B. D. Co.,* 13 Gray, 442 ; *Prentice* v. *Geiger,* 74 N. Y. 341 ; Gould on Waters [2d ed.], § 220 ; *Merrifield* v. *Worcester,* 110 Mass. 221 ; *Hayes* v. *Waldron,* 44 N. H. 585 ; *Townsend* v. *Bell,* 70 Hun, 557 ; *Snow* v. *Parsons,* 28 Vt. 459 ; *Sanderson* v. *P. C. Co.,* 113 Penn. St. 126, 146 ; *K., etc., Mfg. Co.* v. *U. Mfg. Co.,* 39 Conn. 576.) The facts proved and found in this case do not show an unlawful diversion of the stream or of a part thereof. (Gould on Waters, § 213 ; *Garwood* v. *N. Y. C. & H. R. R. R. Co.,* 83 N. Y. 400 ; *Smith* v. *City of Rochester,* 92

N. Y. 463; *N. Y. R. Co.* v. *Rothery*, 132 N. Y. 293; *Parker* v. *Griswold*, 17 Conn. 288.) The question as to whether the use made by a riparian owner of the waters of the stream upon his own riparian lands has been a reasonable one, is a question of fact. (*Prentice* v. *Geiger*, 74 N. Y. 341; *Bullard* v. *S. V. M. Co.*, 77 N. Y. 525; Gould on Waters, § 220; *Dumont* v. *Kellogg*, 29 Mich. 420; *Hayes* v. *Waldron*, 44 N. H. 585; *Merrifield* v. *Worcester*, 110 Mass. 221; *Thomas* v. *Brackney*, 17 Barb. 654; *Townsend* v. *Bell*, 70 Hun, 557; *P. C. Co.* v. *Sanderson*, 113 Penn. St. 126; Cooley on Torts, 582; *Timm* v. *Bear*, 29 Wis. 254; *Gould* v. *B. D. Co.*, 13 Gray, 443.) This action to obtain an adjudication that the use made by defendant of its riparian property is an unreasonable use, and to obtain a permanent injunction against such use, cannot be maintained either on behalf of the fourteen original plaintiffs or on behalf of the seven appellants. (*Reid* v. *Gifford*, Hopk. Ch. 416; *Emery* v. *Erskine*, 66 Barb. 9; *Demarest* v. *Hardham*, 34 N. J. Eq. 469; *Hudson* v. *Maddison*, 12 Sim. 416; *Gray* v. *Rothschild*, 112 N. Y. 668.)

VANN, J. As the findings of the trial court are general and somewhat indefinite, construction is necessary by reading them in the light both of the uncontradicted evidence and of the evidence most favorable to the defendant. When, for instance, the learned trial judge found no diversion of the water and no use of it *except* in making salt upon the defendant's own lands, he did not find that there was no diversion or pollution, and if he had it would have been an error of law, because opposed to the uncontradicted evidence, and open to review by us because the affirmance was not unanimous. So, when he found that the use of the water by the defendant was proper, necessary and reasonable, and such as it was lawfully entitled to make and not prejudicial to the rights of the plaintiffs, it was to some extent a conclusion of law, and, in so far as it was a finding of fact, so general as to require construction through the aid of other facts, either found or uncontra-

dicted. The same is true of the finding that the defendant has not unlawfully diverted or polluted the waters of said stream to the injury or prejudice of the plaintiffs, for as there was manifestly some diversion and some pollution, with some injury and some prejudice, the finding is either against the uncontradicted evidence or simply reflects the opinion of the trial judge that the degree of diminution, pollution and injury was not so substantial as to require action by a court of equity. While the trial judge found that owing to the hills bounding the valley the vapor caused by evaporating salt on so large a scale, " as it condenses into water naturally returns to said stream," he did not and could not find that it all so returned, or state the proportion that escaped. It was impossible for any witness to testify what part of the vapor rising in a narrow valley about two miles wide from summit to summit with comparatively low hills on either side, was carried away and dissipated by the wind, and what part returned to the earth, within the limits of the valley, in the form of mist or rain. The witnesses could not tell from observation, nor state as a fact, where such an invisible, elastic and elusive substance went. There was no evidence of an increase in the rain or moisture. In cold weather, when the water is high, condensation would be rapid, but in warm weather, when the water is scarce, condensation would be slow. Some of the settling tanks are on the hillside, half a mile from the stream. The measurements made below the works included the return by condensation, and there was no evidence to justify the conclusion that all the water diverted reached the stream again. (*Hudson* v. *Rome, W. & O. R. R. Co.*, 145 N. Y. 408, 412.) The counsel for the defendant states in his points that " it is a very moderate estimate to say that at least two-thirds of the escaping steam, on the average, must be condensed and returned to the water supply of Oatka Creek."

The theory upon which the trial judge proceeded to judgment is illustrated in his opinion where he says, " the question is whether it is a reasonable use of the stream to allow the water impregnated with salt to take its natural course into the

stream, impairing its use for drinking purposes, or otherwise affecting its use by the lower proprietors to their injury ? " Discussing the question he further said, " since the salt is a component part of the soil itself, and the owner has a legal right to excavate it and place it upon the surface, it would be an unwarrantable stretch of the powers of a court of equity to compel its removal, merely upon the ground that the surface water, becoming impregnated with the salt, and taking its natural course into a stream, renders its waters unsuitable for drinking purposes, or causes injury to the boilers and machinery of a mill situated far down on the banks of the stream.   *   *   *   The defendant, as a riparian owner, has a right to the natural and necessary drainage of any salt water which may escape from the salt works into the stream.   The water used was returned to the stream in as clear and pure a condition as the nature of the operations upon the lands would permit.   The only obligation resting upon the defendant is to exercise ordinary care so as not to inflict unnecessary injury to the lower proprietors."

Referring to the case of *Barnard* v. *Sherley* (135 Ind. 547), which followed the *Sanderson* case, hereinafter alluded to, he quoted with apparent approval the following therefrom : " Where a work is lawful in itself, and cannot be carried on elsewhere than where nature located it, or where public necessity requires it to be, then those liable to receive injury from it have a right only to demand that it shall be conducted with all due care, so as to give as little annoyance as may be reasonably expected ; and any injury that may result, notwithstanding such care in the management of the work, must be borne without compensation.   It is then a case in which the interest and convenience of the individual must give way to the general good."

Thus the trial judge was of the opinion that the plaintiffs, although they and their predecessors had used the waters of the stream in their mills and on their farms for half a century, could not prevent the defendant, which long afterward and with knowledge of the facts established its plant, from devoting

the stream to a new and unusual use, diverting the water and turning "a fresh water stream into a salt water stream." This would amount to a virtual confiscation of the property of small owners in the interest of a strong combination of capital.

The use made by the defendant of the water of the stream is new and peculiar, for it involves its utter destruction as water. Until it is turned into vapor it refuses to give up its salt, so that it must cease to be water or fail to accomplish the defendant's purpose. That purpose is to utilize only by destroying, not in a scientific sense of course, but in a practical sense. The loss is not incidental by diminution through the process of using the water, as in most cases presented to the courts, but is absolute by means of dissipation through the atmosphere. The diversion is as complete as if the water had been pumped over the hills bordering the Oatka valley and turned into another creek, for diversion, as applied to watercourses, means taking water from a stream and not returning it, so that the lower riparian owner can use it. (*Parker* v. *Griswold*, 17 Conn. 288, 289.) By taking nearly 150 gallons every minute during a working day of ten hours, the defendant diverted that quantity of water from its natural course. The evidence, practically undisputed, shows that the water of the stream, which was fresh before the erection of the defendant's works, is now salt, especially in a dry time. The witnesses who tested it agree that it "tastes salt," and the effect of salt in the water was obvious to the senses in various ways, as by small stalactites of salt formed at leaky spots in the pipes of machinery, the formation of visible crystals on stones in the stream, the rusting of machinery, the foaming of water in the boilers and the destruction of vegetation. The owners of portable steam engines, who formerly used the water in their boilers, abandoned it and resorted to rain or well water. Wells near the stream were affected to some extent. In some places the salt killed vegetation, including willow trees; it destroyed fish in large numbers; cattle and horses refused to drink the water, although some drank it when they had noth-

ing else to drink.   One of the plaintiffs boiled three quarts of
water taken from the race leading to his mill and obtained
nearly a tablespoonful of salt; another could grind only about
half as much grain as he had previously ground at the same
season of the year.

All this evidence and other of like character stands sub-
stantially uncontradicted, as it is not a contradiction for a wit-
ness to say that he did not observe these effects, when he did
not examine in order to see what the facts were.   The only
dispute was in relation to the degree of pollution, and the
defendant's evidence is substantially adopted for the purpose
of this review.   One of its experts, who for twenty years was
the state chemist at the Onondaga Salt Springs, testified that
in a sample taken in December, 1892, above the works, he
found in a gallon of water .086 grains of salt, while a speci-
men taken right below the works contained 305.01 grains.
A specimen taken at the mill of the plaintiff Munger, which
is a mile and one-half below the defendant's works, and is
above all the other salt plants, afforded 99.08 grains, one from
the mill of the plaintiff Martin, about two miles below, 75.69,
another from Brown's pond, still farther down the stream,
82.14.   These samples were taken by the chemist himself,
and, except that last mentioned, were unaffected by any other
source of pollution than the defendant's works.   Thirty-three
other specimens, obtained in April, 1893, still further down
the stream, after many small rivulets, as well as the drainage
from other salt works, had emptied in, but not taken by the
chemist himself, showed much less salt to the gallon, and
averaged between 30 and 40 grains, only two of them exceed-
ing 50.   An analysis made by the plaintiffs' chemist of forty-
four specimens, taken by a hydraulic engineer in September,
October and November, 1892, at points from one-half to one
mile apart, all along the stream below defendant's works,
showed a much larger proportion of salt, averaging, even
after rejecting eleven of the highest, which went up into the
thousands, from 100 to 300 grains to the gallon.   The samples
of the plaintiffs were taken from the stream after the com-

mencement of the action and before the trial, while the
defendant's were taken shortly before or during the trial and
after the changes had been made in order to prevent the salt
water from reaching the creek. While all water contains
some salt, that which contains less than 50 grains to the gal-
lon is, according to the testimony of defendant's expert, suit-
able for use in steam boilers. Brine of full strength contains
18,072 grains to the gallon.

The testimony as to the amount of diminution is less defi-
nite and satisfactory than that relating to pollution, owing to
the difficulty of measuring water flowing in a stream. It is
undisputed, however, that the water diverted, as measured by
defendant's expert, by "four independent but simultaneous
methods," including "weir measurement," which embraced all
water returned to the stream, if used by the plaintiffs to the
best possible advantage, would be equal to nine horse power
daily. One year it amounted to four per cent of the flow at
plaintiff Munger's mill during the whole month of July. The
uncontradicted evidence and the evidence most favorable to
the defendant shows such a degree of pollution, and such an
amount of diminution, as to make it certain, in our judgment,
that the trial judge in his findings meant that neither was in
excess of what the defendant had a lawful right to put in or
take out of the stream in conducting a lawful business upon
its own premises. This theory is confirmed by his opinion, as
he relies largely upon a case in Pennsylvania, which held that
one operating a coal mine in the ordinary and usual manner
may, upon his own lands, drain or pump the water that perco-
lates into his mine into a stream which forms the natural
drainage basin in which the mine is situate, although the quan-
tity of water may thereby be increased and its quality so
affected as to render it totally unfit for domestic purposes by
the lower riparian owners. (*Pennsylvania Coal Company* v.
*Sanderson*, 113 Pa. St. 126.) That case had a varied history
and it was not until it came before the court for the fourth time
that, influenced by the necessities of a great industry, the rule
was laid down as stated. The case was first considered in

1878, when the claim of the lower riparian owner was sustained upon the principle of *sic utere tuo, ut alienum non lædas*. In reply to the argument of counsel that "the law must be adjusted to our great industrial interests" the court said: "In the argument here the ground was distinctly taken that immense public and private interests demand that the right which the defendants exercised in ejecting the water from their mine should have recognition and be established. It was said that in more than a thousand collieries in the anthracite regions of the state the mining of coal can only be carried on by pumping out the percolating water which accumulates in every tunnel, slope and shaft, and which, when brought to the surface, must find its way by a natural flow to some surface stream. It was urged that the law should be adjusted to the exigencies of the great industrial interests of the Commonwealth and that the production of an indispensable mineral, reaching to the annual extent of twenty millions of tons, should not be crippled and endangered by adopting a rule that would make colliers answerable in damages for corrupting a stream into which mine water would naturally run. * * * The consequences that would flow from the adoption of the doctrine contended for could be readily foretold. Relaxation of legal liabilities and remission of legal duties to meet the current needs of great business organizations, in one direction, would logically be followed by the same relaxation and remission, on the same grounds, in all other directions. One invasion of individual right would follow another, and it might be only a question of time, when, under the operations of even a single colliery, a whole country side would be depopulated." In 1880 the case was reviewed a second time and it was again urged that the rights of the riparian owners should yield to the immense public interest involved. The court, however, reaffirmed its former decision, and among other things said: "The mining operations of the defendant do not involve the public welfare, but are conducted solely for the purposes of private gain. Incidentally, all lawful industries result in the general good; they are, however, not the less instituted and

conducted for private gain, and are used and enjoyed as private rights over which the public has no control.    It follows that none of them, however important, can justly claim the right to take and use the property of the citizen without compensation." (*Pennsylvania Coal Co.* v. *Sanderson*, 94 Penn. St. 302, 307.)   In 1883 the court heard the case for the third time, with the same result, but on the last review in 1886, by a vote of four to three, it reversed its previous decisions and held that "the use and enjoyment of a stream of pure water for domestic purposes by the lower riparian owners, who purchased their land, built their houses and laid out their grounds before the opening of the coal mine, the acidulated waters from which rendered the stream entirely useless for domestic purposes, must *ex necessitate* give way to the interests of the community in order to permit the development of the natural resources of the country and to make possible the prosecution of the lawful business of mining coal."   The extensive coal mines of the state of Pennsylvania were regarded as of sufficient importance to warrant the court in departing from the law as previously laid down by itself in the same case; as well as from the rule which prevails in England and in this country, except in some of the states where mining is extensively carried on and there is no way to get rid of the water in the mines except by pumping it into the streams.  (*Clifton Iron Co.* v. *Dye*, 87 Ala. 470.)   Courts of the highest standing have refused to follow the *Sanderson* case (*Columbus, etc., Co.* v. *Tucker*, 48 Ohio St. 41; *Beach* v. *Sterling Iron & Zinc Co.*, 54 N. J. Eq. 65; *Young* v. *Bankier Dist. Co.*, L. R. [App. Cas. 1893] 691); and its doctrine was finally limited by the court which announced it.   (*Robb* v. *Carnegie*, 145 Pa. St. 338.)   The court below, however, manifestly followed the Pennsylvania rule without limitation.  (*Mann* v. *Retsof Mining Co.*, 49 App. Div. 454, 459.)   We have never adopted that rule in this state and no public necessity exists therefor, even if it would ever warrant the courts in relaxing rules for the protection of property of small value in the interest of some business required to develop the resources of the state,

and in which much capital had embarked, giving employment
to a great number of people.

: There is nothing about the case now before us to take it out
of the general rules governing the rights of riparian owners.
Those rules are well established in this state, and, so far as
material to the case before us, are, in the absence of modifica-
tion by grant or prescription, as follows : A riparian owner is
entitled to a reasonable use of the water flowing by his prem-
ises in a natural stream, as an incident to his ownership of the
soil, and to have it transmitted to him without sensible altera-
tion in quality or unreasonable diminution in quantity.  While
he does not own the running water, he has the right to a rea-
sonable use of it as it passes by his land.  As all other owners
upon the same stream have the same right, the right of no
one is absolute, but is qualified by the right of the others to
have the stream substantially preserved in its natural size,
flow and purity, and to protection against material diversion
or pollution.  This is the common right of all, which must
not be interfered with by any.  The use by each must, there-
fore, be consistent with the rights of the others, and the maxim
of *sic utere tuo* observed by all.  The rule of the ancient
common law is still in force ; *aqua currit et debet currere, ut
currere solebat.*  Consumption by watering cattle, temporary
detention by dams in order to run machinery, irrigation when
not out of proportion to the size of the stream, and some
other familiar uses, although in fact a diversion of the water
involving some loss, are not regarded as an unlawful diversion,
but are allowed as a necessary incident to the use in order to
effect the highest average benefit to all the riparian owners.
As the enjoyment of each must be according to his oppor-
tunity and the upper owner has the first chance, the lower
owners must submit to such loss as is caused by reasonable
use.  Surrounding circumstances, such as the size and velocity
of the stream, the usage of the country, the extent of the
injury, convenience in doing business and the indispensable
public necessity of cities and villages for drainage, are also
taken into consideration, so that a use which, under certain

circumstances, is held reasonable, under different circumstances would be held unreasonable. It is also material, sometimes, to ascertain which party first erected his works and began to appropriate the water. (*Clinton* v. *Myers*, 46 N. Y. 511; *N. Y. Rubber Co.* v. *Rothery*, 132 N. Y. 293; *Smith* v. *City of Brooklyn*, 160 N. Y. 357; *Prentice* v. *Geiger*, 74 N. Y. 341; *Bullard* v. *Saratoga V. Mfg. Co.*, 77 N. Y. 525; *Merritt* v. *Brinkerhoff*, 17 Johns. 306; *Crooker* v. *Bragg*, 10 Wend. 260; *Arnold* v. *Foot*, 12 Wend. 330; *Tyler* v. *Wilkinson*, 4 Mason, 397; *Columbus, etc., Coal Company* v. *Tucker*, 48 Ohio, 41; *Beach* v. *Sterling Iron & Zinc Co.*, 54 N. J. Eq. 65; *St. Helens Smelting Co.* v. *Tipping*, 11 H. L. Cas. 642; *Crossley* v. *Lightowler*, L. R. [3 Eq. Cas.] 279; L. R. [2 Ch. App.] 478; *Pennington* v. *Brinsop Hall Coal Co.*, L. R. [5 Ch. Div.] 769; *Attorney-General* v. *Lunatic Asylum*, L. R. [4 Ch. App.] 146; *Hodgkinson* v. *Ennor*, 4 Best & Smith, 229; 3 Kent's Com. 439; Gould on Waters, § 219; Higg Pol. Waterc. 132; Washburn on Easements [4th ed.], 215; 1 Wood on Nuisances, §§ 364, 427.)

The question of reasonable use is generally a question of fact, but whether the undisputed facts, and the necessary inferences therefrom, establish an unreasonable use is a question of law. When the diversion, or pollution, which is treated as a form of diversion, is caused by a new and extraordinary method of using the water, hitherto unknown in the state, and such method not only permanently diverts a large quantity of water from the stream, but also renders the rest so salt, at times, that cattle will not drink it unless forced to by necessity, fish are destroyed in great numbers, vegetation is killed and machinery rusted, such use as a matter of law is unreasonable and entitles the lower riparian owner to relief. Where the natural and necessary result of the place selected, and the method adopted by an upper riparian owner in the conduct of his business is to cause material injury to the property of an owner below, a court of equity will exercise its power to restrain on account of the inadequacy of the remedy at law and in order to prevent a multiplicity of suits. The

41

lower riparian owners are entitled to a fair participation in the use of the water and their rights cannot be cut down by the convenience or necessity of the defendant's business. "The necessities of one man's business cannot be the standard of another's rights in a thing which belongs to both." (*Wheatley* v. *Chrisman*, 24 Pa. St. 298.) While the courts will not overlook the needs of important manufacturing interests, nor hamper them for trifling causes, they will not permit substantial injury to neighboring property, with a small but long-established business, for the purpose of enabling a new and great industry to flourish. They will not change the law relating to the ownership and use of property in order to accommodate a great business enterprise. According to the old and familiar rule every man must so use his own property as not to injure that of his neighbor, and the fact that he has invested much money and employs many men in carrying on a lawful and useful business upon his own land, does not change the rule, nor permit him to permanently prevent a material portion of the water of a natural stream from flowing over the land of a lower riparian owner, or to so pollute the rest of the stream as to render it unfit for ordinary use.

The fact that other salt manufacturers are doing the same thing as the defendant, instead of preventing relief may require it. "Where there is a large number of persons mining on a small stream, if each should deteriorate the water a little, although the injury from the act of one might be small, the combined result of the acts of all might render the water utterly unfit for further use; and if each could successfully defend an action on the ground that his act alone did not materially affect the water, the prior appropriator might be deprived of its use, and at the same time be without a remedy." (*Hill* v. *Smith*, 32 Cal. 166; *Woodyear* v. *Schaefer*, 40 Am. Rep. 419; *Sherman* v. *Fall River Iron Works Co.*, 87 Mass. 213; *Mayor, etc.,* v. *Warren Manufacturing Company*, 59 Md. 96; *Crossley* v. *Lightowler*, L. R. [3 Eq. Cas.] 279; 2 Ch. App. Cas. 478; *Pennington* v. *Brinsop Hall Coal Co.*, L. R. [5 Ch. Div.] 769, 772.)

In Garwood v. N. Y. C. & H. R. R. R. Co. (116 N. Y. 649) the diversion, as shown by the record on file in this court, was less than that testified to by the defendant's witnesses in the case before us. Even if the damages are slight, where the act complained of is such that by its repetition or continuance it may become the foundation or evidence of an adverse right, a court of equity will interpose by injunction. (Amsterdam Knitting Company v. Dean, 162 N. Y. 278, 280.)

The objection that the plaintiffs have no cause of action common to all, and hence that they cannot sue jointly, is unsound. While each owns a distinct piece of land situated upon a part of the stream separate from that abutted upon by the land of every other owner, they all have a common grievance against the defendant for an injury of the same kind, inflicted at the same time and by the same acts. The common injury, although differing in degree as to each owner, makes a common interest and warrants a common remedy. (Emery v. Erskine, 66 Barb. 9, 14; Reid v. Gifford, Hopkins' Ch. 416, 477; Murray v. Hay, 1 Barb. Ch. 59, 62; Blunt v. Hay, 4 Sand. Ch. 362.)

It does not follow from these views that, if upon another trial the facts are unchanged, the defendant and the other salt manufacturers will be compelled to make such terms as they can, for a court of equity, with its plastic powers, can require, as a condition of withholding a permanent injunction, the construction of a reservoir on the upper sources of the stream, to accumulate water when it is plentiful for use in times of scarcity, and thus neutralize the diminution caused by the manufacture of salt. That court may also require, on the like condition, greater care in preventing the escape of salt water and salt substances into the stream, as the defendant attempted to do during the trial, and thus prevent or minimize the pollution.

The judgment of the courts below should be reversed and a new trial granted, with costs to abide the event.

Parker, Ch. J., O'Brien, Bartlett, Landon, Cullen and Werner, JJ., concur.

Judgment reversed, etc.