Michael Catalano, J.
Plaintiffs seek to enjoin defendant from releasing “ treated sewage ” upon their farm land, claiming irreparable damage by flooding, and demand money damages. Defendant contends that it constructed its sewage disposal plant according to plans approved by the Erie County Department of Health, Division of Environmental Sanitation, and that plaintiffs have “unclean hands.”
*108 The court finds, as admitted by the pleadings: That defendant domestic corporation owns premises on the south side of Jamison Boad in the Town of Elma, County of Erie, New York, upon which defendant constructed a sewage disposal plant in the Spring of 1962; that a “ ditch or drain ” runs across defendant’s land, under Jamison Boad, upon plaintiffs’ land on the north side of said Jamison Boad, which plaintiffs occupy as a farm and dwelling; that from time to time effluent from the defendant’s sewage disposal plant flowed and still flows from its sewage disposal plant into that drain or ditch.
The court finds the following additional facts:
Plaintiffs occupied their land for 43 years.
Prior to 1962 and for 43 years, only drain and surface water flowed intermittently through said ditch, from defendant’s higher to plaintiffs’ lower land. In the late Spring and Summer the rains soaked into the dry ground, but in early Spring, Fall and Winter rain and melted snow or ice was in the ditch. After April 15 or May 1 plaintiffs’ land could be plowed. The ditch was formed naturally and was covered with grass, holding water for plaintiffs’ cattle to drink.
Prior to 1962, plaintiffs grew 50 to 60 tons of corn or other crops on said 5 acres, worth $4 a ton. Plaintiffs alternated hay, wheat and oats with the corn; all of which were not sold but fed to their 40 to 50 cattle. Dairy farming is plaintiffs’ chief work and has been for 43 years. Plaintiffs did not want their cattle to drink defendant’s effluent. Near their barn, plaintiffs placed tanks containing drinking water for their cattle. The 5 acres were fenced off so that plaintiffs’ cattle could not drink defendant’s effluent and would not sink into the soft terrain.
In November, 1962, defendant cut the ditch and connected it to its sewage plant from which effluent flowed through a pipe into the ditch to plaintiffs’ land, rendering said five acres unplowable from May, 1963. Water collected in the west side of plaintiffs’ land, then the ditch turned to the northeast where said five acres became soggy and wet and unplowable. Defendant’s effluent overflowed plaintiffs’ said five acres through 1963 and 1965, making it too wet to cultivate, before which time those acres could be cultivated.
Sometimes surface waters start about 2,000 feet south of defendant’s land, flow through defendant’s land north, under Jamison Boad through a 24-foot culvert or pipe installed by the County of Erie, then northwest on plaintiffs’ land, then northeast to the Schultz land on the east, then north under Bice Boad to the Little Buffalo Creek to Big Buffalo Creek, then to Lake *109 Erie. As the ditch reaches said plaintiffs’ five acres, it has no banks, is covered with grass and is undefined as a ditch, making that area susceptible to flooding.
West of plaintiffs’ land is Sauer’s Pond, on the north side of Jamison Road, that runs toward the east to plaintiffs’ said five acres or meadow. No water runs down from that pond in the Summer, although some water comes down in the Fall, Winter and early Spring; which quantity of water has not changed over the many years.
West of that pond is a swamp area which is about 1,575 feet from plaintiffs’ land, the pond being about 1,500 feet from it. The pond and watercourse extending from it to plaintiffs’ land existed for over 40 years.
Defendant’s sewage disposal plant was built in October, 1962, to dispose of toilet-type waste, not industrial waste. It services 1,100 to 1,200 employees, including about 50 employees of Carleton Controls, Inc. About 10,000 gallons of effluent are produced daily, from an average daily sewage of 10 to 15 gallons per person. Although water is not cheap, defendant now has an unlimited supply for its employees’ use. In the Summer of 1964, a sump pump was installed in the filter tank, flowing the effluent on defendant’s land to disperse it as long as the land could absorb it in the Summer months, otherwise it flowed through a drain pipe in the ditch to plaintiffs’ land.
This ditch does not consist of an “ intermittent stream; ” it only flows in early or middle Spring or late Winter, deriving its ultimate source of water from rainfall or snow melt. When it flows, defendant’s effluent runs upon plaintiffs’ land. An “ intermittent stream” is generally considered to be a depression in the ground, having well-defined banks and sides and a hard bottom, through which water flows occasionally.
Plaintiffs’ ditch was seeded to keep the soil from washing out and it was mowed regularly. It has had and still has a top-soil bottom.
Before 1962, the northeast portion of plaintiffs’ land never flooded, and before that time defendant’s sewage was disposed of by septic tanks and sand filter or leech beds, located on the corner of Seneca Road and Jamison Road, at the west of defendant’s land, flowing west under Seneca Road, then to Cazenovia Creek.
The 1962 plant was built pursuant to plans and specifications of a consulting engineer at a cost of $55,000 to $60,000, approved by Robert Roesser, the principal engineer of the Erie County Health Department. This is a four-phase plant consisting of: *110 (1) A septic tank, (2) sand filters, (3) oxidation and photosensitive action, (4) 40 days’ storage in a pond that flows over a wooden gate into a chlorine tank for about one hour’s contact with chlorine.
Roesser, on October 26, 1965, tested defendant’s effluent as to colon bacteria, chemical acidity, biochemical oxygen demand, dissolved oxygen, suspended solids, biological tests and toxicology, concluding that defendant’s disposal plant provides the highest degree of treatment of any such plant in the area.
When Roesser approved defendant’s plans and specifications he believed that the ditch, as such, went through plaintiffs’ lands to Buffalo Creek and based upon this belief he approved them. Roesser had only examined the ditch to Jamison Road but not through plaintiffs’ lands.
In 1963, Roesser went on plaintiffs’ lands, finding a well-defined ditch for 1,000 feet to the north, then it meandered out into a flat area, losing its definition of a ditch and was a mere slope in the land and it ended there. Roesser did not examine beyond plaintiffs’ land to the north. Roesser would not have given his permission to defendant’s plans for this sewage disposal plant if he had known the ditch ran into plaintiffs’ pasture and ended there.
Before 1.962, defendant’s problem was that the filters were plugging. Its effluent from the old system flowed in a ditch that did not pass over plaintiffs’ land. This ditch is still there, flowing west into a highway ditch, under Seneca Road, and eventually to Cazenovia Creek.
Defendant’s land is on a divide of two watercourses and two watersheds. South of the divide, water moves west or southeast to Cazenovia Creek; north of it, water moves northwest to plaintiffs’ land. Defendant could use the highway ditch formerly used to eliminate its effluent into Cazenovia Creek and there would be no problem if all disposal units were working.
In the early English common law the use of water was for domestic or mill purposes on a “ First come, first served,” basis. With the industrial revolution, water was often consumed in large quantities or polluted. The law of riparian rights arose, giving riparian owners on a watercourse equal rights in the water’s use. (Restatement, Torts, ch. 41, pp. 341-342.)
Some courts adopted a natural flow theory, each riparian owner being entitled to have the water kept in its natural state; other courts adhered to a reasonable use theory, whereby each owner could not unreasonably interfere with another owner’s use of the water. (Restatement, Torts, pp. 342-346.)
*111 The first problem is to define a natural watercourse. It is a natural stream, ‘ ‘ flowing in a defined bed or channel, with banks and sides, having permanent sources of supply,” uniform or interrupted, temporarily diminished or suspended, but ‘ ‘ usually a stream of running water.” (Barkley v. Wilcox, 86 N. Y. 140, 143.)
When such a natural watercourse exists, riparian owners in New York State may jointly and reasonably use it. “Bach owner is entitled by virtue of his ownership of the soil, to the reasonable use of the water as it passes his premises, for domestic and other uses, not inconsistent with a like reasonable use of the stream, by owners above and below him.” (Ibid., p. 146.) This is sometimes called the “ common-law rule ” as distinguished from the “ civil-law rule.” (Ibid., p. 145.)
Obviously, if there is no watercourse as defined by law, the landowners have no riparian rights. (See Jeffers v. Jeffers, 107 N. Y. 650, 651.) Since the owner has full dominion over his land above and below the surface, he may fill up wet and marshy places on his own land, caused by surface rain or snow waters to his own advantage even though his neighbor’s land is incommoded thereby. (Kossoff v. Rathgeb-Walsh, 3 N Y 2d 583, 589.)
If a watercourse exists, the reasonable use rule applies. A riparian owner may use the water on his land for domestic purposes in his house and barn and allow his horses, cattle and poultry to consume it; he may use its power to run machinery or irrigate his lands; provided however, the use is reasonable and “ not out of proportion to the size of the stream.” (Pierson v. Speyer, 178 N. Y. 270, 272.) “ The essential question in each particular case is what is reasonable under the conditions and circumstances there presented.” (United Paper Bd. Co. v. Iroquois Pulp & Paper Co., 226 N. Y. 38, 45.)
When the diversion or pollution is a new and extraordinary use of the water, rendering it such that cattle will not drink it unless forced to by necessity, such use as a matter of law is unreasonable as it affects the lower riparian owner. (Strobel v. Kerr Salt Co., 164 N. Y. 303, 321. See, also, City of New York v. Blum, 208 N. Y. 237, 242.) Where the upper riparian owner selects a place or method of conducting his business as to materially injure the lower property, he shall be enjoined. (Ibid.) The courts will not ignore the needs of large manufacturers, nor handicap them for trivia; but on the other hand, they will not permit substantial injury to neighboring property ‘ ‘ with a small but long-established business, for the purpose of enabling a new and great industry to flourish.” (Ibid., p. 322.)
*112 The right to use a watercourse to discharge surface or other waters is limited to waters of which the watercourse is the natural outlet; and “ it does not justify the diversion and turning of the water of one stream into another, not its natural channel, thereby subjecting lands on the stream into which the diversion is made to the servitude or easement of a water-way for the water thus discharged into it.” (McCormick v. Horan, 81 N. Y. 86, 89.) Nor may one owner, by artificial means, concentrate and discharge into the stream surface or other waters “ in quantities beyond the natural capacity of the stream to the damage of other owners.” (Ibid., p. 90. See, also, Peck v. Goodberlett, 109 N. Y. 180, 191.)
It has been held that where defendant’s sewage empties into a creek and other sewers for several miles above plaintiff’s land empty into that creek, and various persons throw rubbish into it, and defendant maintains large catch basins in its sewers before they enter the creek and the sediment from the sewage is cleaned from the basins regularly, discharging only effluent into the creek, plaintiff has no remedy. (Kyser v. New York Cent. R. R. Co., 151 Misc. 226, 228.) The court was quick to add, however: “ Considering the large quantity of water which flows in the creek I do not believe such liquid sewage could materially interfere with the operation of the water wheels on plaintiff’s mill. Plaintiff does not claim that it is necessary for him to use the waters of the creek for domestic purposes nor does he claim any damages on that account.” (Cregg, J., Ibid.)
The court will not grant an injunction which will produce great public or private mischief merely to protect a technical or unsubstantial right. (Gray v. Manhattan Ry. Co., 128 N. Y. 499, 509.) Plaintiff has the burden of proving by a fair preponderance of the evidence the unreasonable user by defendant and substantial damage sustained by plaintiff directly resulting therefrom. (Nolan v. Carr, 19 Misc 2d 167, 171; Treadwell v. Waldeier, 34 Misc 2d 339, 341.) Although plaintiff clearly establishes an unlawful invasion of its rights, if the actual injury from continuing the wrong will be small as compared to the great loss caused to defendant, the court will give great pause to grant-, ing an injunction. (Whalen v. Union Bag & Paper Co., 208 N. Y. 1, 4.) Damages to plaintiff’s farm amounting to $100 or more yearly, where defendant does not show that the wrong will become less injurious in the future, is substantial .and not de minimis non curat lex. (Ibid., pp. 4-5.) Defendant is bound to know the potentialities of its business, to notice the size, course and capacity of the stream it intends to use, to determine *113 at its own peril whether it should be able to conduct its business upon a stream (assuming it is one) the size and character of the one involved without injury to its neighbors, since the size of its investment and its freedom from malice are no defense. {Ibid., pp. 5-6.) The defendant’s receipt of a public agency’s approval of its plans and specifications for a sewage disposal plant that will cast defendant’s effluent into a drain or stream does not per se cloak defendant with immunity from liability to plaintiffs. (Grossman v. Jenad, Inc., 198 N. Y. S. 2d 218, 224 [Supreme Ct., Westchester County].)
Water pollution control has become a State and national problem. (See N. Y. Public Health Law, art. 12, Water Pollution Control, L. 1961, ch. 490, eff. Jan. 1, 1962; Fed. Water Pollution Control Act, U. S. Code, tit. 33, § 466 et seq., as amd. 1961, Pub. L. 87—88; Water Quality Act of 1965, Pub. L. 89-234.) At the 1965 general election, the New York State voters approved a billion dollar State bond issue for sewage treatment plants. “ It is declared to be the public policy of the state of New York to maintain reasonable standards of purity of the waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of fish and wild life, including birds, mammals and terrestrial and aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods to prevent and control pollution of the waters of the state of New York.” (L. 1961, ch. 490, § 5, eff. Jan. 1, 1962. Public Health Law, § 1200.)
The Legislature has excluded from the definition of “ waters ” or “waters of the state ” “ those private waters which do not combine or effect a junction with natural surface or underground waters”. (Public Health Law, § 1202, subd. [b].) It defines “ sewage ” as “ the water-carried human or animal wastes from residences, buildings, industrial establishments or other places, together with such ground water infiltration and surface water as may be present.” (§ 1202, subd. [d].)
Waters are classified and standards adopted by the Water Resources Commission. (Ibid., § 1205.) It is unlawful for any person to discharge into such waters any matter contrary to those standards (Ibid., § 1220); and the construction or operation of a disposal system, without a valid permit is prohibited. (Ibid., § 1222.) A violation of article 12, entitled Water Pollution Control, of the Public Health Law, or an order or determination issued thereunder, may be enjoined by an action brought by the Attorney-General (ibid., § 1251), or may con *114 stitute a misdemeanor. (Ibid., % 1252.) This article provides additional and cumulative remedies to abate the pollution of waters, and docs not estop riparian owners from suppressing nuisances or abating any pollution. (Ibid., §§ 1260, 1262.)
In enjoining a nuisance, there shall be not merely a sentimental, psychological, esthetic or artistic complaint. (66 C. J. S., Nuisances, § 111; Borough of Westville v. Whitney Home Bldrs., 40 N. J. Super. 62, 68.)
The discharge of treated sewage effluent into a running stream is not per se an unreasonable riparian use because today it is common knowledge that such effluent must have an outlet in running waters (Borough of Westville v. Whitney Home Bldrs., supra, pp. 82, 83), or be absorbed by dry soil.
This is a case of first instance. It is not the typical case of an upper riparian owner taking water from a running stream for domestic or industrial use, then discharging it back into the stream without pollution, to flow through and beyond lower riparian land to a large body of water.
Here, defendant buys unlimited water that is piped onto its land for the private toilet use of 1,100 to 1,200 persons. After this sewage is treated, it is pumped through a pipe upon defendant’s land for absorption, or discharged through a pipe drain into a small ditch upon its land. Up to this point, this effluent is private water; it is not “ waters ” or “ waters of the state ” as defined in the Public Health Law (§ 1202, subd. [b].); it does not combine or effect a junction with natural or underground waters on defendant’s land except when heavy, rains or snow melt flows in that ditch; it is not public water. When defendant’s land cannot absorb this effluent, defendant discharges 10,000 gallons of it daily into this small ditch flowing under a road, then upon plaintiffs’ land where it ends and floods five acres the year round, rendering them too wet and soft for planting crops or grazing cattle. The crops are necessary to feed plaintiffs’ cattle used in plaintiffs’ dairy farming. To date, plaintiffs were substantially damaged at the proven rate of $200 per year by the flooding caused from defendant’s effluent. Although this effluent has received the highest degree of treatment of any disposal plant in the area, it would demand the most robust “ intestinal fortitude ” to imbibe the same. Nonetheless, it is the unreasonable quantity, not the quality, of the effluent that continues to damage plaintiffs’ land. By its direct, recurrent, intentional trespass upon plaintiffs’ land, defendant has flooded plaintiffs’ land in order to keep its own from flooding, *115 thereby appropriating plaintiffs’ land pro tanto, in the nature of guare clasum fregit (seeking damages for unlawful entry). In such a case, injunction should issue and damages be assessed.
Where an unreasonable quantity of private water is discharged into a drainage ditch to the material injury of neighboring land, it is no defense that said water is effluent treated by defendant’s sewage disposal plant which had been approved by the County Department of Health.
Plaintiffs have clean hands. Their recovery for trespass, nevertheless, is limited to damages accruing prior to the commencement of this action in early 1964; damages for trespass in 1964 and thereafter call for another action. (B & R Luncheonette v. Fairmont Theatre Corp., 278 App. Div. 133, 134, mot. for lv. to app. dsmd. 302 N. Y. 944. See, also, Laurence v. Tucker, 160 Ore. 474, 483; Casanover v. Villanova Realty Co., 209 S. W. 2d 556, 560 [Mo.].)
This decision (CPLR 4213) states all of the essential facts.
Therefore, let defendant be enjoined from releasing “ treated sewage ” upon plaintiffs’ farm land and let defendant pay plaintiffs $200 as damages for the 1963 trespass.