Van Voorhis, J. (dissenting).
Article 12 of the Public Health Law (added by L. 1949, ch. 666) is designed to regulate what waters of the State are required to be pure, what waters may continue to be heavily polluted, and between these extremes to provide for the establishment of various grades of required purity or permitted pollution. This act applies to all of the waters in the State from tidewaters and the largest lakes and rivers to the smallest mountain rill. We are required on these appeals to rule upon questions of constitutionality and statutory construction affecting waters everywhere in the State.
Article 12 of the Public Health Law is an exercise of the State’s police power. It offers compensation to no municipality or other abutting property owner that may be adversely affected. Therefore no riparian rights of property owners can be taken nr impaired. The Act substantially provides that no riparian rights are intended to be affected (§§ 1243, 1260- *185 1261). The Act is not confined in its operation to the abatement of public health nuisances. There is no finding that the discharge of sewage into the Mohawk River by the Town and the Village of Waterford, which is the subject of this proceeding, constitutes a public health nuisance. The contrary is implied in the record. The action by the Water Pollution Control Board now under review is not sought to be upheld on the basis that this is a public nuisance.
The police power extends to the abatement of public health nuisances. In aid of the conservation of water as a natural resource, it also extends to the regulation of the purity of water where there is no public nuisance so long as the riparian rights of municipalities or other property owners are not violated (People v. New York Carbonic Acid Gas Co., 196 N. Y. 421; Hathorn v. Natural Carbonic Gas Co., 194 N. Y. 326; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61; Bandini Co. v. Superior Ct., 284 U. S. 8; 18 Am. Jur., Eminent Domain, § 162, pp. 793-794).
In deciding whether the Legislature intended that in making these classifications the Water Pollution Control Board should take into account the economic burden cast upon neighboring municipalities and property owners, and whether the authority to make such classifications of water pollution is a constitutional delegation of power to the Board, it is necessary to examine this subject in at least three aspects: (1) public health nuisances; (2) conservation of water as a natural resource where public health nuisances are absent in areas where riparian rights are not infringed and (3) destruction or impairment of riparian rights.
Before considering what authority the Legislature has delegated or could delegate to the Board, it is important to examine the extent of the police power of the State in these fields. Public nuisances can, of course, be enjoined without payment of compensation to riparian owners. As has been stated, there is no finding that this is such a case. The action taken by the Board, on the record before us, can only fall within the scope of the police power if it is directed to the conservation of water as a natural resource without the infringement of riparian rights of municipalities or other property owners. That would be equally true if the elassifica *186 tion of this portion of this river had been made directly by the Legislature instead of by the Board. The subject of riparian rights is complex, often varies according to the circumstances of the particular situation, and sometimes depends upon the financial investment of the riparian owner in the use which he makes of the water and on the expense of eliminating such use. The ‘ ‘ indispensable public necessity of cities and villages for drainage ” was held to pertain to the determination of riparian rights in Strobel v. Kerr Salt Co. (164 N. Y. 303, 320). The expense of altering the use of its water rights was held to be a factor in determining the extent of such rights in McCann v. Chasm, Power Co. (211 N. Y. 301) and expense is mentioned as a factor in considering riparian rights in a pollution case, where it was said in City of New York v. Blum (208 N. Y. 237, 243):
‘£ The question in a nutshell is whether it is reasonable for the defendant to divert the water from its natural channel and to return it, laden with the excreta of his domestic animals, when he can with slight trouble prevent such pollution. * * * He can * * * by a little labor prevent the pollution of the loaters of the stream.’’ (Italics supplied.)
Expense of this nature was recognized as a factor in determining riparian rights in Parker v. American Woolen Co. (195 Mass. 591); City of Battle Creek v. Gognac Resort Assn. (181 Mich. 241), and Aberdeen v. Lytle Logging & Mercantile Co. (58 Wash. 368). Expense cannot be ignored in all instances in determining where the police power ends and riparian rights begin, when the latter depend upon such complicated and varying circumstances as are described in the leading case of Strobel v. Kerr Salt Co. (164 N. Y. 303, supra).
The constitutionality of statutes limiting or controlling the exploitation or waste of natural resources, in the exercise of the police power, has received attention in the courts. (See, for example, annotations at 24 A. L. R. 307 and at 78 A. L. R. 834.) Bipariian rights 'are always considered in relation to the effect which the use of water by one riparian owner has upon other riparian owners. Somewhat similar factors are involved in percolating waters, where, as in the case of riparian owners, *187 the use which is made of the water must be reasonable or it ceases to be a property right of the owner of the land (Forbell v. City of New York, 164 N. Y. 522, 526). The well-known Saratoga Springs cases establish the right of the State to prevent waste for the conservation of natural resources, without compensation to the owner of the land, where the use prevented by the State is not appurtenant to his ownership. That was held to be true even where the neighboring property owners were not objecting. The comprehensive opinion per Hiscook, J., in Hathorn v. Natural Carbonic Gas Co (194 N. Y. 326, supra) is applicable to article 12 of the Public Health Law which we are now considering. Having said in that case that the landowner had no vested right to the unreasonable use of underground waters, that opinion states (p. 343):
“ This being so, it was entirely proper for the legislature to adopt the provision in question defining and regulating the rights of persons desiring to use mineral waters like those at Saratoga Springs and calculated to prevent such use thereof as would either result in waste of the natural resources of the land to the injury of general and public interests, or in the unreasonable impairment of the rights of others entitled to draw from a common source.”
The context indicates that where the landowner has unreasonably impaired the rights of others to the water, he possesses no vested right to such use of the waters with the consequence that the State may prevent it in the interest of conservation without payment of compensation. But that such a rule is limited to instances where the property owner is making an unreasonable use of the waters was held in People v. New York Carbonic Acid Gas Co. (196 N. Y. 421, supra) where the Hathorn case was limited to that situation. The later decision held that the recital in the statute that its purpose was to prevent waste and impairment of the natural mineral waters of the State did not extend to the prevention of uses of the subsurface waters by the landowner which do not infringe the rights of other owners. To cope with such instances it became necessary to resort to the power of eminent domain by enacting a statute providing compensation to those affected *188 by the taking (L. 1909, ch. 569; People v. New York Carbonic Acid Gas Co., supra, p. 436). The same principles prevailed in Lindsley v. Natural Carbonic Gas Co. (220 U. S. 61, supra) and formed the basis for the decision by the United States Supreme Court in the leading natural gas conservation case of Bandini Co. v. Superior Ct. (284 U. S. 8, supra). The circumstance that article 12 of the Public Health Law relates to the conservation of water as a natural resource does not authorize the Water Pollution Control Board to appropriate water rights if in fact and in law they belong to another. If the condition is not a public nuisance, and if the use which is made by the riparian owner of the water is reasonable so as to be within his riparian rights, such rights cannot be confiscated even for purposes of conservation. Conservation of natural resources was not enough to justify adding lands to the Forest Preserve except on payment of compensation to the owner (People v. Adirondack Ry. Co., 160 N. Y. 225, affd. 176 U. S. 335). Waters (with the exception, later to be mentioned, of the Hudson and Mohawk Rivers) cannot be diverted for public consumption without payment of damages to riparian owners (Smith v. City of Rochester, 92 N. Y. 463; see, also, Water Power & Control Comm. v. Niagara Falls Power Co., 262 App. Div. 460, affd. 289 N. Y. 353). Even the discharge of sewage may pertain to riparian rights under certain circumstances, as is indicated by Judge Vakk’s opinion in Strobel v. Kerr Salt Co. (supra) (Kyser v. New York Central R. R. Co., 151 Misc. 226). Since article 12 of the Public Health Law requires the Water Pollution Control Board to draw the line between what is a reasonable and an unreasonable use of the water by riparian owners as bearing upon the extent of riparian rights (e.g., § 1202, subd. [g]; § 1209), it cannot escape the necessity of considering on occasion the costs to riparian owners of changing the uses which they make of the water. The reasonableness of the use is an established standard for determining whether or not it belongs to the abutting owner as a riparian right. Costs of alteration, under the established rule, may affect what is a reasonable use.
Except for the special rule limiting the rights of owners along the Mohawk and Hudson Rivers (People ex rel. Loomis v. Canal Appraisers, 33 N. Y. 461; Gould, Law of Waters, § 246), it *189 would in all probability have been necessary—unless the condition were found to be a public health nuisance—for the Board to have considered the expense of the construction of sewage disposal plants in the case of municipalities bordering the river, as a factor in determining whether or not the uses which they made of the water exceeded their riparian rights.
Even in the absence of vested rights in riparian owners, article 12 should not be construed as meaning that the Board must ignore entirely the economic burdens of its classifications. Assuming that riparian rights of owners along the navigable fresh rivers of New York State cannot be impaired without compensation, “ with the exception that the riparian owners upon the Mohawk River are not, by certain decisions, entitled to damages for any diversion or use of the waters of that river by the State ” (Glould, Law of Waters, supra, § 246), and that by reason of these decisions the Water Pollution Control Board was not obliged to consider whether the Town and Village of Waterford own any riparian property rights to the use of water, in my view article 12 of the Public Health Law still requires the expense of complying with the Board’s classifications to be regarded as a factor, although not necessarily the controlling factor, in arriving at its decision. Possibly no raw sewage should be allowed to be discharged anywhere into the Mohawk River, even if the contention of appellant municipalities proves to be correct that it would result in increasing their tax rates by 150%. We do not have before us the question whether any municipality should be allowed to empty sewage into the Mohawk River without treatment, but we do have to decide whether the Board has to take into account the costs imposed upon them by forbidding them to do so. How pure we may think that the Mohawk River ought to be is unrelated to the decision of this appeal. What we are required to decide is whether the Board has to give any attention to the costs resulting from classifications which it • imposes, which involves whether the Legislature intended that water pollution control should have priority over other public purposes where insufficient funds or credit are available to provide for them all.
According to a memorandum in evidence, by the Executive Secretary of the Board, classification of the degree of purity or pollution of all waters “ must be taken irrespective of what *190 the cost might he to any municipality for complying with the adopted classes and standards.” The classifiation by the Board is the most vital step in its proceedings. The classification of waters determines what municipalities and other property owners are required to do in order to rectify whatever conditions of pollution the Board decides should be abated. The Board interprets its own powers to be such as to give priority to its water purification plans, even where no public health nuisance is involved, ahead of expenditures for schools, highways, urban redevelopment, social security, public hospitals and other aspects of public health, relief, even ahead of public water supply systems which are under the Water Power and Control Commission and are made secondary to the Water Pollution Control Board. That is true for the reason that no matter how pressing these other demands upon the public purse may be, they must be left out of effective consideration if the available funds or credit of municipalities have to be committed first to the dictates of the Water Pollution Control Board. If cost is not a limiting factor in water pollution control, which it is not according to the legal position of the Board, cost does limit the full realization of all of these other commendable public purposes which also have their advocates and disciples. They must all take second place if there is not enough money to go around. The Joint Legislative Committee on whose report this legislation was adopted had no such idea, as shown by the comment in its report that municipalities in the State will include some whose fiscal condition will not ‘ ‘ permit them to issue bonds for necessary public works, including sewers and sewage treatment works ’ ’ and others ‘ ‘ which still have financial ability to undertake the required sanitation work but which have other improvements scheduled or contemplated, which they must undertake. ’ ’ The committee further stated:
6 ‘ An analysis of all the municipalities which fall into the above categories would reveal information of great value and importance to the proposed pollution control board, and would serve as the basis of a constructive approach to the fiscal problem.” (N. Y. Legis. Doc., 1949, No. 51, p, 36.)
*191 Such fiscal information could be of no value or importance to the Board if the statute requires the Board to disregard it.
No reason is apparent on account of which the statute should not be construed according to its language in harmony with these comments in the report of the Legislative Committee which drafted it and recommended its adoption. Section 1209 states that it is recognized that, due to variable factors, no single standard of quality and purity of waters is applicable to all waters of the State or to different segments of the same waters, and that in order to attain the objectives of the statute, the Board shall group the designated waters of the State into classes. Such classification, it is provided, “ shall be made in accordance with considerations of best usage in the interest of the public” and with regard to enumerated considerations. Among these considerations are the uses which have been made, are being made or may be made of the waters “ for transportation, domestic and industrial consumption, bathing, fishing and fish culture, fire prevention, the disposal of sewage, industrial waste and other wastes, or other uses within this state ” and under certain circumstances outside of the State. The extent of present defilement or fouling of the waters is to be considered as a factor and qualities and properties of water are to be prescribed that are adapted to ‘ ‘ the use of such waters for domestic, commercial, industrial, agricultural, recreational or other reasonable purposes ”. The character of the district bordering the waters is to be considered, and its peculiar suitability for the particular uses, ‘ ‘ and with a view to conserving the value of the same and encouraging the most appropriate use of lands bordering said waters, for residential, agricultural, industrial or recreational purposes ”. This is to be done according to “a general comprehensive plan” and ‘ ‘ recognizing different requirements for separate waters and for different segments of the same waters ”, and the standard or standards to be applied signify such measure of purity or quality for any waters “in relation to their reasonable and necessary use, as may be established by the board ” pursuant to this article.
These standards prescribed by the Legislature cannot be applied without consideration by the Board of costs to municipalities or other abutting owners resulting from compliance *192 with, the adopted classes and standards as a measure of purity. Clearly this idea is conveyed by these provisions. The object, to be sure, is to attain the maximum degree of purity which is desirable or practical having regard to all of these circumstances, but no uniform standard of purity is formulated or ordered by the Legislature. On the contrary, it is specifically stated that varying standards shall be applied, depending on the uses which have been made or may be made of the waters for many purposes, including the disposal of sewage or industrial waste and the extent of present defilement or fouling of the waters. The standards to be applied by the Board are such as are consistent with the reasonable uses of the water, in the interest of the public, which includes a view to the character of the district bordering the waters, and its peculiar suitability for particular purposes and the conservation of its value. There is not a word here to warrant ignoring the cost of eliminating pollution as one of the elements entering into the decisions of the Board in making these classifications. It may well be that cost would not be taken into account if the Board has made a finding based on evidence that a particular condition constitutes a public health nuisance, but that is not this case nor the usual case.
The basis for the conclusion that in adopting classifications of water purity the Board is not required to consider or give any weight to fiscal considerations is mainly section 1224 of article 12 of the Public Health Law. This section empowers the - Board to grant an extension not in excess of five years if it finds it to be impossible or impracticable to comply with the prescribed standards of purity because of financial inability ' to construct the necessary sewage treatment works or provide other means of disposal of waste. Extentions of time beyond this five-year period may be granted if the person involved shows to the satisfaction of the Board that he. has diligently tried to comply with the orders of the Board. In all proceedings under section 1224, the burden of proof is on the person applying for postponement to show that it is not possible to comply with the Board’s classifications. This section contains no token of an intention to prohibit the Board from considering the economic burden in arriving at its classifications in the first place, nor to dispense with its doing so as a part of the *193 reasonable exercise of judgment required of it in establishing these standards of purity, fío extension even for five years or less can be obtained under this section if the necessary sewage treatment works or other means of disposal can be constructed within the financial ability of the municipality, even if that necessitates the deferment of other public projects which have an equal claim on the resources of the community. That contradicts the further declaration by the Joint Legislative Committee in 1950 (after this legislation had been adopted) that
“ In a balanced fiscal program, the municipal needs for sewage treatment construction must be integrated with the other public improvements required by each community. While sewage treatment cannot be overstressed at the expense of other public works, neither can it be overlooked.5 ’ (N. T. Legis. Doc., 1950, fío. 74, pp. 173-174.)
It seems that the interpretation placed by the Board upon its own powers is not in accord with the conception of the statute by the Joint Legislative Committee which recommended this legislation. As we have seen, earlier annual reports of the committee also stressed the importance of fiscal factors in accomplishing the program. The possibility of exemption of pollution elimination bonds from debt limits or authorization of sewer rents could not have been regarded as a substitute for considering the factor of expense by the Board before requiring the construction of such public improvements. Exemption from debt limits does not create credit nor imply an intention to justify the exhaustion of credit by municipalities for one purpose without considering the urgency of the fulfillment of other municipal purposes. It does not integrate the municipal needs for sewage treatment with other public improvements which the community requires. Erasing debt limits or authorizing sewer rents could not have been expected alone to solve these financial problems or to avert the necessity for considering them in ordering classifications. If the resulting economic burden is to be disregarded by the Board in classifying standards of purity or pollution of waters, the Board would have jurisdiction to direct (and might consider *194 its duty to be to direct) that the Hudson River, for example, should be made simon-pure. Such a result might well be desirable except that it would cost too much. I think that the Legislature did not intend to empower the Board to do that, even "though the Board might stay its mandated classification indefinitely for economic reasons. One should not readily conclude that the Legislature has directed the Board to order Utopia, but postpone its realization until the Millenium. If such an illustration seems overdrawn, that is because it seems absurd to think that the Board would make such a classification of the Hudson River. But this is absurd only if it is taken for granted that the Board would be influenced by the huge cost of such a project and would decline so to classify the Hudson River on account of the expense. The record indicates that the Board did postpone the classification of another portion of the canalized Mohawk River on account of the cost of treatment of industrial waste. No suggestion has been made by anyone, least of all in this dissenting opinion, that the Board has been actuated in what it has done by anything but the best motives, and the record shows that in at least one instance the Board has had and I believe it would have the common sense in administering this law to disregard its own legal theory that in making classifications costs are to be ignored. The Legislature did not intent to permit the Board to consider or ignore cost factors as it chose. Either such factors must be considered or they must be left out of consideration. They may, of course, be considered and overruled where not of controlling importance. A fiction that fiscal matters are irrelevant when they are really being acted upon would prevent the parties from presenting the facts upon which their cases depend, and would require the Board to obtain its information through outside channels. It would also limit the court review of determinations by the Board which the Legislature provided by section 1244, inasmuch as there cannot be intelligent review unless the ostensible reasons for decision are the real reasons.
It is the contention of the Board a.s appears from respondent’s brief that the establishment of standards of purity and quality of waters and the classifiation of the waters of the .State is the exercise of a quasi-legislative function, and is not reviewable as a quasi-judicial determination and that findings *195 of fact need not be made in respect thereto. But section 1244 states that all orders or determinations of the Board shall be subject to review as provided in article 78 of the Civil Practice Act, and provides that for purposes of review the petition to the court shall state ‘ ‘ that the classification of waters, standards of quality and purity thereof, or any finding, determination, decision or order of the board is illegal, in whole or in part ” and shall specify the grounds of the illegality. (Italics supplied.) By this express language the Legislature provided that classifications of waters should be reviewable in court. This is understandable since it is the classification (not the subsequent formal orders to be served on municipalities) which determines that sewage treatment plants must be constructed by appellants. If that cannot be reviewed, review of the subsequent order is an empty form.
It is apparent, for example, that a classification of the waters of the State is quasi-judicial insofar as it may be based upon a determination that the existing condition constitutes a public nuisance, or, if it does not constitute a public nuisance, that it involves or does not involve infraction of riparian rights. It is reviewable in court if the record indicates, as it does here, that even though no public nuisance or riparian rights are involved, the Board has not been actuated by a consideration of all of the factors which the law requires in arriving at its decisions concerning classification. A rate-making case was recently remanded to the Public Service Commission, although rate making has been denominated a quasi-legisl'ative function, for the reason that the commission in arriving at its decision failed to take into account all of the necessary factors required by law (Matter of New York Tel. Co. v. Public Service Comm., 309 N. Y. 569).
The Water Pollution Control Board made no findings of fact, which are required by section 1208 (subd. 3, par. [b]) and are necessary for the purposes of intelligent judicial review and to assure the parties to the litigation that decisions have been reached on the evidence (Matter of Elite Dairy Prods, v. Ten Eyck, 271 N. Y. 488, 498; Matter of New York Water Service Corp. v. Water Power & Control Comm., 283 N. Y. 23, 30, 32; Matter of New York State Guernsey Breeders Co-op. v. Noyes, 284 N. Y. 197, 204-205; Matter of Dusinberre v. Noyes, 284 *196 N. Y. 304, 308; Matter of Collins v. Behan, 285 N. Y. 187; Mason v. Lory Dress Co., 277 App. Div. 660; Benjamin, Administrative Adjudication in the State of New York [Report to Governor Lehman, 1942], pp. 251-253; see, also, Florida v. United States, 282 U. S. 194). These decisions hold that it was incumbent on the Board to make findings showing that facts have been found which are necessary to give the Board jurisdiction to make the classifications of water involved in its determination, and that, where such findings of fact are lacking, the matter should be remitted for the purpose of making such findings. Without these findings it is impossible to decide whether the conclusion reached is in accordance with law.
The contention of the Board that the classification of standards of purity and quality of the waters of the State is wholly a legislative function does not strengthen its position that legislative power has not been delegated in violation of the Constitution (Packer Collegiate Inst. v. University of State of N. Y., 298 N. Y. 184; Matter of Levine v. O’Connell, 275 App. Div. 217, affd. 300 N. Y. 658; Matter of Fink v. Cole, 302 N. Y. 216, 225; Darweger v. Staats, 267 N. Y. 290; Panama Refining Co. v. Ryan, 293 U. S. 388; Schecter Cory. v. United States, 295 U. S. 495). If the jurisdiction of the Water Pollution Control Board were held to be subject to the legal standards that I have outlined as being intended by the statute, I would agree that there has been a valid delegation of authority under the opinion written by Judge Fuld in Matter of City of Utica v. Water Pollution Control Bd. (5 N Y 2d 164), decided herewith. The trend of the times and of the decisions requires the delegation of power to boards and commissions in fields where the circumstances of particular cases are too varied and complicated for the Legislature to act separately in each situation. Nevertheless where power is conferred upon a board or commission the Legislature cannot constitutionally authorize such a body to exercise a deformed judgment founded upon some but not all of the relevant factors which are necessary to a rational determination upon the subject. The cost of construction of municipal sewage disposal plants or plants for the treatment of industrial waste need not be the deciding factor in arriving at classifications of water by the Board, and in cases of public health nuisances (which it does not appear that this is) such *197 costs may not be a factor at all (Whalen v. Union Bag & Paper Co., 208 N. Y. 1). But except where public health nuisances are involved, a rational judgment cannot be formed without counting the cost. If the Legislature were confronted with legislating on what should be the degree of purity of the Mohawk River in the vicinity of Waterford, every relevant factor would be before it for consideration, and it would be presumed to have taken into account all facts and factors bearing upon the situation (Noyes v. Erie & Wyoming Farmers Co-op. Corp., 281 N. Y. 187, 195; Szold v. Outlet Embroidery Supply Co., 274 N. Y. 271, 278). It may well be that the Legislature in such case would not regard the expense as warranting the prevention of such a classification, but that phase of the question would be before the Legislature which would ascribe to it such weight or importance as it might deserve in the particular case. If cost were not deemed to be a controlling consideration respecting the Town and Village of Waterford, it might weigh more heavily in the case of waters or watercourses elsewhere in the State. Nevertheless I think that an act of the Legislature would be an unconstitutional exercise of its own power if it attempted to legislate with regard to the purification of waters, water supply, education, hospitals, highways, urban redevelopment, social security or other public works or projects at the same time certifying that it had not considered all relevant factors but had ignored the costs of ■such projects and had given no thought to how they should be borne or how they would affect the people of the State. It is not too much to say that it would be an invalid exercise of the legislative power vested in the Senate and Assembly by section 1 of article III of the State Constitution if the Legislature were to attempt to circumscribe its own power in these respects by the adoption of a self-denying ordinance eliminating from the legislative judgment the consideration of factors which cannot be eliminated from the formation of a reasonable judgment upon the subject. If the Legislature cannot thus hobble its own deliberations, it cannot do the same to the deliberations of a board or commission. No valid enabling act can compel a board to exercise a warped and unbalanced judgment by directing it to eliminate relevant factors from consideration which cannot rationally be eliminated. The Legislature cannot *198 delegate power to a board to solve a problem while looking into only part of it.
The language of article 12 of the Public Health Law does not require this narrow, and, as it seems to me, strained interpretation, but if the Board insists on circumscribing its deliberations and if the courts construe the statute as commanding this, then the Act is an unlawful delegation of authority. The Legislature has not reserved power in itself to consider these fiscal factors except by amending this legislation, and the Board may not consider them under such an interpretation except to defer classifications that have already been adopted and been given priority over other municipal projects. In short, under this interpretation, these fiscal factors are left to be considered by nobody in making these water classifications. It is impossible to form a rational or balanced judgment on these matters if -fiscal considerations must be totally ignored. On the record before us the members of the Board in administering this statute are prevented from using their own good judgment by a -legal ruling that in arriving, at -their conclusions they cannot count the cost. Whether in some instances they would arrive at the same conclusions after counting the costs is not for the court here to determine. It is inconceivable that the Board would do so in all'instances, yet this construction of the statute makes it mandatory.
- If this statute is so construed and is valid, then similar action can be taken in regard to the numerous other functions of government in other fields that are regarded as important and are energetically supported by other equally public spirited groups in the community. If the expense of all such projects can be left out of account, and each governmental function, however important, were to be given its head without being-limited by this practical but unpopular hindrance, the administration of governmental projects of all kinds, instead of becoming integrated as the Joint Legislative Committee said, would be thrown into chaos. Not only would this render it impossible, in the language of the committee, ‘ ‘ to clarify the position which pollution control must play in a comprehensive statewide public improvements program ” (N. Y. Legis. Doc., 1950, No. 74, pp. 173-174), but the record shows that no comprehensive plan for pollution control of the Mohawk River has been *199 formulated as the statute requires (cf. need for a comprehensive plan in zoning cases, Buckley v. Fasbender, 1 N Y 2d 681).
In summary, this case docs not involve pollution in such degree or under such circumstances as have been found to constitute a public health nuisance, nor is there presented a question of the infraction of riparian rights in the absence of rights of riparian owners along the Mohawk River to damages for diversion or use of the waters (People ex rel. Loomis v. Canal Appraisers, 33 N. Y. 461, supra, followed in Williams v. City of Utica, 217 N. Y. 162, 168-169; Gould, Law of Waters, § 246). I have assumed that the police power extends to the conservation of water as a natural resource for future expansion in population and industrial use, where vested rights of riparian owners are not impaired, and that the purpose of this classification goes beyond improving the fishing in a few places in the Mohawk River. Nevertheless, even though in this instance no vested riparian rights of municipalities or other property owners appear to be involved, the power to regulate the purity of water for its conservation as a natural resource is not unlimited and has been delegated to the Water Pollution Control Board by the Legislature subject to its exercise in accordance with certain prescribed canons of judgment which include among other elements consideration of the incidence of the economic burden resulting to riparian owners from classifications of water by the Board. Finally it is my conclusion that unless the Board is authorized by this legislation to consider (not necessarily to be controlled by) the economic burdens resulting from these classifications, this would necessarily distort the judgment of the Board in many cases by compelling it to act without considering all of the material factors, and would give water purification projects priority over other desirable purposes even where no public health nuisance is involved and without integrating their necessity or desirability. In that case the Legislature has acted in excess of its power contrary to section 1 of article III of the State Constitution. The Legislature did not, in my belief, intend to grant such priority. However important the conservation of water resources may be, it cannot be accomplished in my opinion by a statute construed so as to cause the Board to exercise a mutilated judgment by charging it with responsibility for the whole problem while allowed to think about only part of it.
*200 This opinion, it is perhaps unnecessary to add, is not intended in criticism of the Water Pollution Control Board or of its Executive Secretary or Legal Counsel. But the case is an instance of a tendency, unhappily too familiar, of hoards and commissions consisting of public spirited members and formed for laudable purposes being drawn as by a law of nature into becoming “ separate, largely independent, miniature governments ” each with “ its own constituency, ambitions, and policies” (Robert H. Jackson: The Supreme Court in the American System of Government, p. 50). It is but a mild limitation on the functions of the respondent if, without curtailing its powers, it is required to examine into the costs which it •imposes as I believe the Legislature intended.
The order appealed from should be reversed and the proceeding remitted to the Water Pollution Control Board for rehearing in accordance with this opinion.
■ .Chief Judge Conway and Judges Desmond, Dye, Fuld and Burke concur with Judge Froessel ; Judge Van Voorhis dissents in an opinion and votes to remit the matter to the Water Pollution Control Board for a rehearing in accordance with his dissenting opinion herein.
Order affirmed.